Sherry L. HOUCK, Plaintiff,

v.

CITY OF PRAIRIE VILLAGE, Charles F. Grover and Barbara Vernon, Defendants.

No. 95–4067–RDR.

United States District Court, D. Kansas.

Sept. 23, 1997.

Harold S. Youngentob, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Plaintiff.

Patricia A. Bennett, Bennett, Lytle, Wetzler, Martin & Pishny, L.C., Prairie Village, KS, Mark D. Katz, Steven D. Steinhilber, Thaddeus J. McDonald, III, Sherman, Taff & Bangert, P.C., Kansas City, MO, for City of Prairie Village, Kansas.

Patricia A. Bennett, Bennett, Lytle, Wetzler, Martin & Pishny, L.C., Prairie Village, KS, David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, for Charles F. Grover, Barbara Vernon.

Lawrence L. Ferree, III, Kirk Thomas Ridgway, Ferree, Bunn & O'Grady, Chtd., Overland park, KS, for Johnson County Sheriff's Dept.

### MEMORANDUM AND ORDER

ROGERS, District Judge.

This is an employment discrimination case which is before the court upon motions for summary judgment by defendants City of Prairie Village and Barbara Vernon. For the reasons which follow these motions shall be granted.

UNCONTROVERTED FACTS

Upon review of the pleadings, the following facts appear to be uncontroverted or must be accepted as true when the record is considered in a light most favorable to plaintiff.[1]

On May 21, 1990, plaintiff was hired by the City of Prairie Village ("the City") as a Community Service Officer ("CSO") in its police department. Bill Price was already working as a CSO when plaintiff was hired. CSOs performed animal control, street crossing, and other support duties for the police department. While she was a CSO, plaintiff

---

1. In compiling this recitation of facts, the court has considered the additional "uncontroverted facts" advanced in plaintiff's motion to supplement. Doc. No. 70. To that extent the motion shall be granted. The court has also considered and agreed to some extent with defendant City's objections to plaintiff's supplementary facts. However, the court does not believe it is necessary or beneficial to grant the City an opportunity to supplement the record further.

orally complained to persons in the police department, including her supervisors, that Bill Price made unwelcome sexual comments. No written complaint was made. The alleged comments were in the nature of a proposition and descriptions of his sexual preferences. No corrective action was taken. Plaintiff signed forms in 1991 and 1992 which stated that she had not been subjected to or observed others suffer sexual harassment. Plaintiff did not take these forms seriously and feared retaliation if she did make a written complaint.

In May 1992, plaintiff was informed that her job as a CSO was going to be eliminated. Bill Price's job as a CSO was maintained. He had more seniority than plaintiff, although she felt she was more qualified by the end of her CSO tenure.

On July 4, 1992, plaintiff married John Houck, a member of the City's police department. For several months prior to being married, plaintiff and John Houck lived together. In September 1992, plaintiff was transferred from the police department to the City's public works department. While working in the public works department, plaintiff performed such tasks as snow removal and road maintenance.

Throughout plaintiff's employment with the City, she wanted to work in the police department as a dispatcher or in another capacity. She made application for a job as a police officer. After she married John Houck, such employment was contrary to the City's anti-nepotism policy. So, plaintiff was never hired onto the police force.

Defendant Barbara Vernon has been the city administrator of Prairie Village for over 18 years. She was also acting public works department director from late September 1993 to mid-March 1994.

Shortly after plaintiff started in the public works department she was reprimanded by the public works director at the time, Gerald Robnett, concerning the use of sick leave when she was gone from work because of the illness of her sister-in-law. Plaintiff complained that her husband in the police department was not reprimanded for using his sick leave in the same situation. Plaintiff believes that Robnett consulted with Barbara Vernon on this matter and that she allowed the reprimand to happen.

A year after plaintiff started working in the public works department she filed a grievance regarding her seniority within the department. Plaintiff wanted credit for the time she worked in the police department. This would have given her the upper hand over some employees in bidding for a night shift snow removal position or other positions. The grievance was denied by defendant Vernon. Vernon made this decision after talking with people from other public works departments and persons being interviewed for personnel director. Vernon also was concerned with morale within the department and believed that persons with the most experience running the snow plow should be working on a snow removal night shift. Plaintiff had no experience running a snow plow.

Plaintiff was the only full-time female employee doing work on the public works department crews. Plaintiff alleges that when she started male workers whistled at her. One employee, John Waller, grabbed his crotch whenever plaintiff passed. He also used coarse language, referring to plaintiff once as a "laughing bitch" and frequently saying "eat me." Plaintiff alleged that Waller grabbed at everyone's butt and referred to everyone as "baby."[2] She reported her objections to Waller's behavior several times. However, she only spoke once to Barbara Vernon about John Waller. This was in December 1993.

Waller was reprimanded in June 1994 by Bob Pryzby. This was almost two years after plaintiff started working in the public works department. Pryzby was appointed the director of public works in March 1994. Specifically, Pryzby disciplined Waller after plaintiff complained that Waller grabbed his crotch. Waller received a one-day suspension without pay and was required to seek

---

**2.** Waller denies many of these allegations. But, for the purposes of the instant motions, we accept the allegations as true.

counseling. Plaintiff asserts that thereafter Waller retaliated against her. But, her deposition does not specify what the nature of his retaliation was. Plaintiff states that she complained about it to her supervisor at the time (Stan Turowski), but nothing happened. Then, she complained to Bob Pryzby. However, she does not know what happened in response to her complaints.

Plaintiff also complained to Pryzby concerning Playboy magazines or similar periodicals in the trucks of the department. Pryzby quickly directed that all such materials be removed.

Dan Ogle was one of plaintiff's first supervisors. Plaintiff objected to Ogle's statement in October of 1992 that he and the other employees should stop treating plaintiff as a woman and stop helping plaintiff with things. By April 1993, plaintiff had complained about Dan Ogle several times to Steve Sherman, the assistant public works director. She felt as if Ogle singled her out for criticism in front of coworkers. This criticism concerned tearing out sod while mowing grass. Moreover, he had crew members retrained on mowing. This made plaintiff feel responsible for "punishment" of the entire crew. She also objected that Ogle insisted she take a test on chemicals instead of an equipment operation test that he encouraged other male employees to take. Eventually, Ogle was reprimanded because of plaintiff's complaints. He was also required to take sensitivity training. In addition, plaintiff was transferred by Barbara Vernon to a different crew with a different supervisor in August or September 1993. Plaintiff contends that the reprimand was too gentle and that it was ineffective at stopping harassment.

Plaintiff also appealed an evaluation of her work which Ogle helped complete with another supervisor. Barbara Vernon discussed the evaluation with plaintiff and made some changes as a result of the discussions. The revised evaluation was signed by a supervisor other than Ogle. This was in December 1993. About the same time, defendant Vernon sug-

gested playing videotapes regarding sexual harassment and discrimination for employees in the public works department. Plaintiff asked that this not be done because she was afraid the employees in the department would blame her. Plaintiff explained that she told Barbara Vernon not to do it for plaintiff's benefit, but for her own benefit.

Barbara Vernon did conduct a safety meeting for public works department employees on January 7, 1994. Among many topics, the subject of sexual harassment was discussed. Plaintiff, Dan Ogle, Stan Turowski and John Waller were some of the employees who attended this meeting.[3]

Vernon testified that she thoroughly investigated every matter raised to her by plaintiff. However, she also remarked that sometimes her efforts were hindered by plaintiff's refusal to give names or plaintiff's requests that Vernon not get involved. For instance, in December 1993, plaintiff made her complaint to Vernon about John Waller. She complained that John Waller had "gone off on her," called her names and mocked her by bending over. When Barbara Vernon said she would take care of it, plaintiff told her it had already been taken care of by Stan Turowski. Plaintiff's position may have been motivated by a feeling that she had been "set up" by Vernon in the past. In other words, plaintiff felt that complaints she made to Vernon resulted in ill feelings against her by public works employees.

Plaintiff complained that Tim Goodman told her not to service the equipment that he used although she was qualified to do the work. Plaintiff told Barbara Vernon about this. As a result, Tim Goodman was reprimanded with a final warning. Dan Ogle testified that Steve Sherman told him not to allow plaintiff to service her own equipment, although plaintiff apparently did not complain about this.

Plaintiff testified that she had several problems with Stan Turowski when he was her supervisor. Specifically, she resented Turowski for grabbing a shovel or rake from

---

**3.** Plaintiff has objected to the evidence of this meeting because it has been presented in the form of a post-deposition affidavit from Barbara Vernon. However, plaintiff has not established how the evidence is inconsistent with Vernon's deposition or otherwise shown why the evidence should not be considered. Therefore, plaintiff's objection is denied.

plaintiff's hands as if (in plaintiff's opinion) she could not do the work necessary to spread material dumped by a backhoe. This incident occurred during the filming of a video promoting the City. From this event, both Turowski and plaintiff received reprimands from Bob Pryzby in May 1994. Plaintiff was reprimanded for failing to report the incident immediately; Turowski was reprimanded for overriding plaintiff's role on the job. In her deposition, plaintiff did not specify what problems she had with Stan Turowski while Barbara Vernon was acting public works director. She did testify that the problems were severe.

Plaintiff stated that Ron Wilson of the public works department told her, "No, Sherry. I need a man," when he was looking for a hand on an asphalt crew.[4] This occurred in front of Steve Sherman, who later told plaintiff that the statement was not exactly what Wilson meant.

Plaintiff resigned from her job in the Prairie Village public works department effective April 3, 1995 and took a job with a nearby community. She believes that the majority of the people in the public works department treated her well. Nevertheless, she contends that she was forced to resign because of the harassment she suffered within the department. While Pryzby denies that plaintiff complained of harassment when she left the City's employment, it is agreed that plaintiff said she was unhappy with her work.

At the times relevant to this lawsuit, the City had a written policy which prohibited sexual harassment in the work place and provided procedures for handling complaints of alleged harassment.

Barbara Vernon has attended courses regarding employment discrimination and sexual harassment. She has passed information along to other city department managers on these topics. In the late 1980s, prior to plaintiff's employment, she spoke to the public works department concerning the City's sexual harassment policy. In 1990 or 1991, she and some public works department assistant directors attended a training session given by the City Attorney. In addition, movies or videos regarding sex discrimination were shown to the public works department at different times before and during the period of plaintiff's employment.

## PLAINTIFF'S CLAIMS

The original complaint lists claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1983 against the City. These claims assert a hostile work environment, a discriminatory failure to hire, and disparate terms and conditions of employment. Plaintiff has also alleged a state law claim under the theory of outrage against the City.[5] Plaintiff's complaint alleges a violation of § 1983 against defendant Vernon by reason of Vernon's claimed failure to prevent or eliminate the alleged hostile work environment.[6]

## SUMMARY JUDGMENT STANDARDS

The court has previously reviewed the well-known standards governing summary judgment motions. *Houck v. City of Prairie Village*, 912 F.Supp. 1438, 1441 (D.Kan.1996). That discussion shall be incorporated herein by reference.

## ARGUMENTS FOR SUMMARY JUDGMENT

*Statute of limitations*

■ The City contends that some of plaintiff's claims are barred by the statute of limitations. The court agrees.

Under Title VII, plaintiff must file her charge with the EEOC within 300 days of the conduct giving rise to her claim. 42 U.S.C. 2000e–5 (e). Under § 1983, plaintiff must file her complaint with this court within two years of the conduct giving rise to her claim. *Baker v. Board of Regents*, 991 F.2d 628, 630 (10th Cir.1993).

---

4. Plaintiff appears to attribute this statement to Dan Ogle in her complaint before the Kansas Human Rights Commission.

5. Plaintiff's complaint additionally alleges a claim under the Kansas Act Against Discrimination, K.S.A. 44–1001 *et seq.* However, plaintiff is withdrawing that claim. Plaintiff has previously withdrawn any claim against Vernon involving the application of the anti-nepotism policy.

6. The court has previously granted judgment against plaintiff's claim of outrage against defendant Vernon.

Plaintiff filed her EEOC charge on May 20, 1994. The 300–day period before this date began on July 24, 1993. Plaintiff filed her complaint in this court on April 26, 1995. Thus, in most situations, any alleged misconduct occurring before April 26, 1993 could not be the subject of a claim under § 1983 or Title VII. Since plaintiff started working in the public works department in September 1992, defendant contends plaintiff's allegations regarding her employment as a CSO and her initial employment in the public works department cannot be the basis for relief.

Plaintiff contends that the continuing violation doctrine permits her to recover for alleged misconduct occurring prior to the beginning of the limitations period. The court rejected this contention at least as it applied to plaintiff's employment as a CSO and her attempts to become a police officer prior to April 26, 1993, when the court ruled upon a motion for reconsideration by defendant Vernon. *Houck v. City of Prairie Village,* 924 F.Supp. 120 (D.Kan.1996). The same ruling shall be made here with regard to plaintiff's claims against the City.

To invoke the continuing violation doctrine, plaintiff must demonstrate either: 1) a series of related acts against a single individual, at least one of which falls within the limitations period; or 2) a company-wide policy of discrimination both before and during the limitations period. *Purrington v. University of Utah,* 996 F.2d 1025, 1028 (10th Cir.1993).

The court is convinced that plaintiff is unable to prove a continuing violation under either standard. Without repeating what was stated in the court's previous ruling in this case, we would emphasize that plaintiff's claims in her complaint regarding her employment as a CSO do not involve harassment. Her claims in her complaint concern the elimination of her CSO job and the failure to be hired as a regular police officer. Although plaintiff has testified in a deposition that she was offended by comments made by a fellow CSO (Bill Price), she has not alleged in her complaint that these comments were part of a hostile work environment. However, plaintiff's complaint does allege that she encountered a hostile work environment, in other words sexual harassment, when she started at the public works department.

In response to the instant motions, plaintiff asserts that harassment can include behavior which is not explicitly sexual. While this may be correct, the fact remains that plaintiff's complaint does not claim a hostile work environment during her work as a CSO. Indeed, it stretches the meaning of "harassment" too far in this context, to include the failure to hire and job termination claims which arose during plaintiff's tenure as a CSO. Moreover, even if the different acts were all considered harassment, the actions are not related because they stem from different jobs, different co-workers, and different supervisors. In addition, many of the actions were so final or permanent that they cannot be considered part of a continuing violation.[7] Finally, we do not construe plaintiff's claims as alleging a city-wide policy of sex discrimination and harassment.

For all of these reasons, we shall grant summary judgment against any claims arising from plaintiff's work as a CSO or her attempts to become a police officer prior to the beginning of the limitations periods, or her reprimand for the use of sick leave.

*Anti-nepotism policy*

Plaintiff makes two claims regarding the City's anti-nepotism policy: first, plaintiff asserts that the rule operated to exclude plaintiff from her position as a CSO; second, plaintiff contends that the rule operated to eliminate her from the hiring list of police officers or dispatchers for the City. Doc. No. 64, p. 52.

The policy states:

"Immediate family relatives will not be hired by the City. If two employees become related while they are employed by the City, they both may continue to be employed by the City unless they work in

---

**7.** Plaintiff's claims regarding the reprimand for the use of sick leave and the elimination of her CSO position are examples of actions which were sufficiently permanent and isolated that plaintiff should have been aware of the need to assert her rights if she felt they were acts of discrimination.

the same department and one is in a supervisory relationship to the other. If the affected employees work in the same department and one is in a supervisory relationship to the other, and if a position of equal grade and pay is open in another department for which one of the affected employees is qualified, that employee will be given the opportunity to transfer to the open position. If no transfer position becomes available within 90 days from the date the employees become related, the affected employees must choose which one of them will resign from employment with the City, and if one of the employees does not submit a resignation within five working days thereafter, the employee with the least amount of service with the City will be required to resign."

Plaintiff's first claim is barred by the statutes of limitations governing § 1983 and Title VII for reasons previously discussed.[8] Furthermore, the evidence in the record indicates that plaintiff was informed before she married a City police officer that her CSO position was going to be eliminated. Consequently, it does not appear that plaintiff could prove that the anti-nepotism policy caused the elimination of her position as a CSO.

■ Regarding plaintiff's second claim, the court concurs with the cases cited in the parties' briefs which hold that an anti-nepotism policy does not amount to unconstitutional discrimination based on marital status. *Wright v. MetroHealth Medical Center,* 58 F.3d 1130 (6th Cir.1995) *cert. denied,* —— U.S. ——, 116 S.Ct. 1041, 134 L.Ed.2d 188 (1996); *Waters v. Gaston County,* 57 F.3d 422 (4th Cir.1995); *Parks v. City of Warner Robins,* 43 F.3d 609 (11th Cir.1995).

■ Nor is there evidence in the record which shows that the policy has a discriminatory impact against women or has been applied in a discriminatory fashion against women. Consequently, with this record no reasonable jury could conclude that plaintiff has proven sex discrimination through the operation of the anti-nepotism policy. *See Parks,* 43 F.3d at 616–18 (no equal protection violation shown); *Garcia v. Spun Steak Co.,* 998 F.2d 1480, 1486 (9th Cir.1993) *cert. denied,* 512 U.S. 1228, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994) (impact analysis for hiring decisions requires objective, quantifiable proof); *cf., Thomas v. Metroflight, Inc.,* 814 F.2d 1506, 1509–10 (10th Cir.1987) (the statistical significance required for impact analysis cannot be established when only two women are affected by anti-nepotism policy).

■ Plaintiff has suggested that the policy violates K.A.R. 21–32–4.[9] However, even if the policy did violate this regulation, the regulation itself provides no private right of action (see *Citizens State Bank v. Gilmore,* 226 Kan. 662, 603 P.2d 605, 613 (1979)) and plaintiff is not suing under a statute which provides a right of action for violating the regulation.[10]

For these reasons, plaintiff's claims of discrimination based upon the operation of the anti-nepotism policy shall be dismissed.

*Hostile work environment under Title VII and § 1983*

■ Plaintiff alleges that she was the victim of sexual harassment because of a hostile work environment which allegedly existed while she worked in the public works department.

In *Winsor v. Hinckley Dodge, Inc.,* 79 F.3d 996, 1000 (10th Cir.1996), the Tenth

---

8. It should also be remembered that plaintiff is no longer promoting a claim under the K.A.A.D.

9. K.A.R. 21–32–4(b) states:
"An employed woman should not have her employment terminated when she marries a man who works for the same business or institution by whom she is employed. At the same time, a woman should not be denied employment by an employer due to rules against nepotism if she is otherwise qualified to perform the required work."

10. Even if plaintiff were bringing a claim under the K.A.A.D. and could show a discriminatory impact from the anti-nepotism policy, the law would not be violated if there was a valid business necessity for the policy. K.S.A. 44–1009(a)(1). Many courts have found a valid business reason for anti-nepotism policies. E.g., *Wright,* 58 F.3d at 1136–37; *Waters,* 57 F.3d at 426–27; *Parks,* 43 F.3d at 615.

Circuit summarized the requirements for a hostile work environment as follows:

A hostile work environment exists when a plaintiff is subjected to sexual harassment "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" [*Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57] at 67, 106 S.Ct. at 2405 [(1986)] (citation omitted). Sexual harassment is behavior "'that would not occur but for the sex of the employee'.... 'If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination.'" *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1537 (10th Cir. 1995) (citations omitted).

The existence of sexual harassment must be determined "in light of 'the record as a whole' and [courts must examine] 'the totality of [the] circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" *Meritor Savings,* 477 U.S. at 69, 106 S.Ct. at 2406 (citations omitted). The mere utterance of a statement which "'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.* at 67, 106 S.Ct. at 2405 (citations omitted).

In order to survive summary judgment, plaintiff must show facts that support an inference of a sexually hostile environment and support a basis for liability. *See Bolden v. PRC, Inc.,* 43 F.3d 545, 551 (10th Cir. 1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). Plaintiff must show specifically that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was sexual or stemmed from sexual animus. *Id.* "General harassment if not.. sexual is not actionable." *Id.*

Factors which a court may look at in determining whether alleged misconduct created a hostile work environment include: the frequency of the misconduct, its severity, whether the misconduct is physically threatening or merely consists of an offen-

sive utterance, and whether the misconduct unreasonably interferes with plaintiff's work performance. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

Plaintiff worked in the public works department for more than two and one-half years. She was whistled at initially, but apparently did not complain. She witnessed coarse gestures (crotch grabbing) and crude language from a co-worker, John Waller, over a lengthy period of time. Her complaints apparently did little to stop Waller's conduct until she spoke to Bob Pryzby in June 1994. Pryzby suspended Waller one day without pay. His conduct changed after that, although he engaged in unspecified retaliation. The record indicates that Waller did not reserve his crass behavior to plaintiff or women in particular.

Plaintiff disliked Dan Ogle as a supervisor. Ogle was plaintiff's supervisor from September 1992 until the summer of 1993. He singled plaintiff out for criticism, misevaluated her work, impeded plaintiff's efforts to take an equipment operator's test while encouraging males to do so, and commented that department personnel should stop "treating plaintiff as a woman." Plaintiff complained to the assistant public works director, Steve Sherman, several times about Ogle. She also complained to Barbara Vernon. As a result, plaintiff eventually was moved to a different supervisor, her evaluation was changed, and Ogle was directed to take sensitivity counseling.

Plaintiff also complained about Tim Goodman, who told her not to service his equipment. Mr. Goodman received discipline for this comment.

She complained about Stan Turowski, her supervisor after Dan Ogle. She and Turowski received discipline in 1994 regarding one incident in which he grabbed an implement from her hands. Plaintiff also heard a comment from Ron Wilson who told her he needed a man for an asphalt crew he was forming. Plaintiff did not complain about this comment. Steve Sherman was present when the comment was made; so plaintiff may have

felt a complaint should have been unnecessary.

Plaintiff has stated that the majority of the employees of the public works department treated her well. Plaintiff has also made general statements that harassment or retaliation continued after discipline was administered. But, it is unclear what specifically happened.

Plaintiff's counsel has also made reference to comments by Barbara Vernon in her deposition to the effect that plaintiff suffered "from time to time" from a hostile work environment as defined by the City's policy statement. The court believes that these comments are of little evidentiary value. The City's policy statement does not explicitly define "hostile work environment." Nor is there any other indication that Vernon's use of the term comports with the definition of "hostile work environment" relevant to these proceedings. Furthermore, the comment in isolation is broad and conclusory and not helpful to the understanding of Vernon's testimony or the material issues in this case. Consequently, the court places little value upon it. See *Watts v. Kroger Co.*, 955 F.Supp. 674, 678 (N.D.Miss.1997) (striking similar comment in an affidavit from a plaintiff opposing summary judgment).

The court does not believe any reasonable jury would find that the actions substantiated in the record, read in a light favorable to plaintiff, created a hostile work environment. The alleged incidents of misconduct are spread out over two and one-half years. They do not involve physically threatening conduct. Waller's alleged language and gestures, while crude, mostly appear to be sophomoric rather than vituperative or hostile. On occasion, plaintiff was able to receive some relief when she did complain, although sometimes she had to complain numerous times or to persons other than her immediate supervisor. Other times plaintiff did not complain, thus indicating that the alleged misbehavior was not greatly offensive and did not interfere with her work.

In sum, the court is convinced, looking at the record in a light most favorable to plaintiff, that plaintiff could not prove the atmosphere at the public works department was so permeated with discriminatory intimidation, ridicule, and insult that it was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. This is the standard for proving liability for a hostile working environment under Title VII. *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1175 (10th Cir.1996) citing, Harris, 510 U.S. at 21, 114 S.Ct. at 370. We believe the same standard would apply under § 1983. See *Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir.1997); *Jemmott v. Coughlin*, 85 F.3d 61, 67 (2d Cir.1996). Plaintiff's inability to satisfy this standard warrants summary judgment in favor of defendants.

*Municipal and supervisory liability under § 1983*

■ Even if there was sufficient evidence of a hostile work environment to permit plaintiff's claims under Title VII and § 1983 to go forward, the court believes there is insufficient evidence in the record to permit plaintiff's claims against defendants as an employer or supervisor to proceed under § 1983.

Municipal liability under § 1983 was recently discussed by the Tenth Circuit in *Jenkins v. Wood*, 81 F.3d 988, 993–94 (10th Cir.1996):

A municipality may not be held liable under 42 U.S.C. § 1983 simply because it employs a person who violated plaintiff's federally protected rights. *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989); *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir.1993). If the plaintiff asserts the alleged custom or policy comprised a failure to act, he or she must demonstrate the municipality's inaction resulted from "deliberate indifference to the rights" of the plaintiff. *Harris*, 489 U.S. at 389, 109 S.Ct. at 1205. More specifically, if the

inaction theory rests on an alleged failure to train, the plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for additional training. *Id.* at 390, 109 S.Ct. at 1205.

With regard to supervisory liability, the Tenth Circuit stated in the same opinion:

> To prevail on a claim for damages for a constitutional violation pursuant to 42 U.S.C. § 1983, a plaintiff must establish the defendant acted under color of state law and caused or contributed to the alleged violation. *Ruark v. Solano,* 928 F.2d 947, 950 (10th Cir.1991); *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir.1990); *Bennett v. Passic,* 545 F.2d 1260, 1262–63 (10th Cir.1976). The plaintiff must show the defendant personally participated in the alleged violation, *Bennett,* 545 at 1262–63, and conclusory allegations are not sufficient to state a constitutional violation. *Wise v. Bravo,* 666 F.2d 1328, 1333 (10th Cir.1981). Though state actors who participate in a violation in a supervisory role may incur liability, " 'there is no concept of strict supervisor liability under section 1983.' " *Ruark,* 928 F.2d at 950 (quoting *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984)). In other words, it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation. Instead, just as with any individual defendant, the plaintiff must establish "a deliberate, intentional act by the supervisor to violate constitutional rights." *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir.1992) (citing *City of Canton,* 489 U.S. at 389, 109 S.Ct. at 1205.) A plaintiff may satisfy this standard by showing the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance. *Woodward* 977 F.2d at

1400 (citing *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3d Cir.1990)); see also *Kite v. Kelley,* 546 F.2d 334, 337 (10th Cir.1976). .

*Id.* at 994–95.

The court does not believe that any reasonable jury reading the record in a light most favorable to plaintiff would conclude that either the City or defendant Vernon had acquiesced or was deliberately indifferent to the existence of a hostile working environment in the public works department. The City had a policy against sexual harassment. Training took place to help implement this policy. Both defendant Vernon and Bob Pryzby, as public works directors or city administrator, made investigations and took actions in response to plaintiff's complaints to prevent the appearance or perception of sexual discrimination. Accordingly, both defendants are entitled to summary judgment on this grounds against plaintiff's claims under § 1983.

*Terms and conditions*

It is not clear that plaintiff is actively advancing a claim of discrimination in the terms and conditions of her employment apart from the alleged hostile work environment. However, if plaintiff intends to promote separately the allegations in the original complaint regarding seniority and evaluations, the record is barren of supporting evidence. There is no evidence to support a claim that either the City or Barbara Vernon is liable for discriminating against plaintiff on the basis of her gender in evaluating plaintiff's job performance or in denying the transfer of seniority from the police department to the public works department. Accordingly, summary judgment is warranted against these claims.

*Outrage*

A state law claim of outrage remains against the City. The City has not asked for summary judgment against the outrage claim.[11] But, as this order dismisses all fed-

---

11. The City's motion for summary judgment appears targeted at the claims contained in plaintiff's "Revised Factual Contentions and Legal Theories" which apparently is a document prepared in contemplation of a final pretrial order.

However, since a final pretrial order has not been filed and no other stipulation has been entered which lists plaintiff's claims, the court has used the original complaint as the controlling list of plaintiff's claims.

eral law claims in this case, the court shall decline to exercise jurisdiction over any remaining state law claims. See *Panis v. Mission Hills Bank,* 60 F.3d 1486, 1492 (10th Cir.1995) *cert. denied,* — U.S. —, 116 S.Ct. 1045, 134 L.Ed.2d 192 (1996).

CONCLUSION

Plaintiff's motion to supplement (Doc. # 70) shall be granted. For the above-stated reasons, the motions for summary judgment of defendants City of Prairie Village and Barbara Vernon shall be granted.

**IT IS SO ORDERED.**